IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

WENDY WALTON d/b/a SPENCER    )
STAFFING, INC.,    )
    )
    Plaintiff,    )    NO. 3:17-cv-1324
    )    JUDGE RICHARDSON
v.    )
    )
INTERSTATE WAREHOUSING, INC.,    )
    )
    Defendant.    )

## MEMORANDUM OPINION

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 40, "Motion"). Plaintiff has filed a response (Doc. No. 47, "brief in opposition"), and Defendant has filed a reply (Doc. No. 52). For the reasons stated herein, Defendant's Motion for Summary Judgment will be granted in part and denied in part.

## BACKGROUND[1]

Plaintiff Wendy Walton ("Plaintiff") is the founder and sole owner of Spencer Staffing, an employment company[2] that, at all times relevant herein, provided temporary employees to Defendant Interstate Warehousing, Inc. ("Defendant" or "Interstate"). Spencer Staffing and

---

[1] Unless otherwise noted, the facts in this background section are taken from the parties' Responses to the Statements of Undisputed Material Facts (Doc. Nos. 50 and 53).

[2] Plaintiff is an individual who does business as a sole proprietorship. Therefore, even though Plaintiff does business under a trade name ("Spencer Staffing, Inc."), the Court will refer to Plaintiff as "she," rather than "it." It likewise will, for the most part, refer to Plaintiff's sole proprietorship as "Plaintiff" rather than "Spencer Staffing" or "Spencer Staffing, Inc." since legally the sole proprietorship and its owner are one. The Court notes that the "Inc." after "Spencer Staffing" in the trade name is inappropriate inasmuch as the business was a sole proprietorship rather than a corporation.

Interstate Warehousing, Inc. entered into a Staffing Agreement ("the Agreement") on December 28, 2015. In pertinent part, the Agreement provides:

> Interstate has the right to reject any individual referred by Staffing Firm[3] and Staffing Firm and/or the employee of Staffing Firm has the right to reject the assignment to Interstate.
>
> . . .
>
> Staffing Firm warrants that all temporary employees assigned to Interstate from time to time are the employees of Staffing Firm and not the employees of Interstate.
>
> Staffing Firm shall hire and assume responsibility, as provided under the terms of this Agreement, for certain personnel ("Staff") to perform work for Interstate.
>
> . . .
>
> Staffing Firm as the employer of such staff as are assigned to and utilized by Interstate will, with respect to such workers, be solely responsible for:
>
> > (a) Making all proper payroll deductions, including income tax and Social Security tax deductions . . .
> >
> > (b) Making all payments, including payments for income tax, Social Security tax and unemployment and disability insurance . . .
> >
> > (c) Providing workers' compensation coverage . . .
> >
> > . . .
>
> Staffing Firm further represents and warrants that it shall offer a health plan to the temporary employees, which health plan shall satisfy the requirements of both IRC Section 4980H(a) and IRC Section 4980H(b).

(Doc. No. 40-1 at 8-10). The gist of the agreement was that Plaintiff would find and submit for Defendant's consideration candidates for temporary, and perhaps eventual permanent, placement as forklift operators for Defendant; if Defendant accepted and took on a particular candidate for placement, the candidate would become Plaintiff's employee for payroll and certain administrative purposes, and in return for handling these payroll and administrative functions, Plaintiff would be reimbursed the payroll costs (wages, employment taxes, etc.) and also paid a fee for placed candidate.

---

[3] The Agreement identifies Spencer Staffing as the "Staffing Firm." (Doc. No. 40-1 at 1).

On April 14, 2016, Brian Blaylock, the Human Resources Director for Defendant's Murfreesboro facility, informed Plaintiff that Defendant planned to suspend its placement of temporary employees. Defendant represented to Plaintiff that it had suspended placement because it had no current need and was overstaffed and that it had accepted very few employees from any temporary employment agency, not just Spencer Staffing, during this time.[4] In November 2016, Defendant made the decision not to continue to do business with Plaintiff.[5] Defendant alleges that its accounting staff had issues with Plaintiff's payroll and invoices throughout Defendant's entire relationship with Plaintiff. (Doc. No. 50 at ¶ 47). Plaintiff asserts that both Plaintiff and Defendant made errors with payroll and invoices during the parties' business relationship. Plaintiff alleges that Defendant ended their business relationship because Plaintiff complained about discriminatory placement practices,[6] namely, Defendant's unwillingness to accept[7] men over 40 years old or women (of any age). (Doc. No. 22, ¶¶ 14-17).[8]

---

[4] Plaintiff denies these allegations (Doc. No. 50 at ¶¶ 22-23), but she fails to cite anything to support those denials, as required by Local Rule 56.01(c)(3).

[5] Although Defendants refer to this decision simply as "ending the relationship" with Plaintiff, there is no evidence that the Agreement remained in effect, and the Court interprets the decision as terminating the Agreement.

[6] Defendant adamantly denies that Plaintiff ever questioned Defendant's placement practices. *See, e.g.,* Doc. No. 50 at ¶ 74 and Doc. No. 53 at ¶¶ 16, 35, 37, 39-41, 44-47, 49-51, and 67-68.

[7] The Court refers herein to Defendant "accepting" (or not "accepting") candidates, rather to than Defendant "hiring" (or not "hiring") candidates. This is because, as specifically provided in the Agreement, candidates accepted by Defendant to work for Defendant were "hired" by Plaintiff, as the Agreement specifically calls it, as Plaintiff's employees. For similar reasons, the Court refers to Defendant's "placement" practices rather than its "hiring" practices, and to candidates "place[d]" or not "place[d] with Defendant rather than to candidates "hired by" Defendant.

[8] Although Plaintiff contends in the Amended Complaint that Defendant refused to accept men over the age of 40, she has not argued that part of her claim in response to Defendant's Motion, wherein she refers (obliquely) to such refusal only once (Doc. No. 47 at 21) and instead focuses exclusively on Defendant's alleged failure to accept women.

Plaintiff sued Defendant, pursuant to this Court's diversity jurisdiction (28 U.S.C. § 1332), for violations of the Tennessee Human Rights Act ("THRA"), intentional interference with business relationships, and breach of contract. (Doc. No. 22).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628.

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at ** 5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## TENNESSEE HUMAN RIGHTS ACT

The THRA prohibits discrimination by an employer based upon gender and age (Tenn. Code Ann. § 4-21-401(a)) and prohibits retaliation against a person who opposes a practice declared discriminatory by the THRA. Tenn. Code Ann. § 4-21-301(a). Plaintiff maintains that

Defendant violated these provisions by refusing to accept women and by retaliating against her for opposing Defendant's placement practices. She asserts that she has a cause of action under the THRA based on such alleged retaliation

Defendant argues that the THRA prohibits discrimination and retaliation *by employers,* and Defendant was not Plaintiff's employer. Defendant contends that Plaintiff lacks standing to bring a discrimination claim under the THRA because Plaintiff has alleged that Defendant discriminated not against *her* but rather against female *candidates for employment*.

With regard to discrimination, the relevant statute states: "It is a discriminatory practice for *an employer*" to discriminate based upon gender or age. Tenn. Code Ann. § 4-21-401(a) (emphasis added). Defendant argues that Plaintiff, because she cannot bring this claim for herself, could only possibly bring such a claim if it was based upon third-party standing. (Doc. No. 41 at 4).

However, Plaintiff does not appear to be claiming that Interstate discriminated against *her* because of her gender or her age. (Doc. No. 47 at 10-14). Instead, she alleges discrimination only against *female candidates for employment* (a category in which she is not included because she was not a candidate for employment with Defendant). She asserts two theories for relief under the THRA. The first (which seems best characterized as a "discrimination" theory) posits that she herself suffered damages (in the form of lost fees) directly from Defendant's discrimination against the female candidates she submitted for placement with Defendant. The second is a retaliation theory, positing that she herself suffered retaliation for opposing Defendant's discrimination against women candidates. In response to Defendant's motion, she focuses on her retaliation theory and argues that "Defendant's third-party standing analysis is unnecessary." (*Id.* at 14). Indeed, because she has not argued in support of the discrimination theory in her response to the Motion, it seems that Plaintiff well may have implicitly abandoned that theory.

The Court finds that Plaintiff's THRA claim cannot survive under the discrimination theory, not only because she has not asserted it in her response to the Motion, but alternatively because she cannot show (and does not even claim) that Interstate was her employer. Plaintiff's relationship with Interstate was contractual. As evidenced by the undisputed facts above, Plaintiff was not an employee of Interstate; Plaintiff was an independent contractor. The Sixth Circuit has held that federal employment discrimination statutes protect employees but not independent contractors. *Miller v. Quisenberry*, No. 1:19-cv-44, 2020 WL 375788, at * 3 (S.D. Ohio Jan. 23, 2020) (citing *Shah v. Deaconess Hosp.*, 355 F.3d 496, 499 (6th Cir. 2004) (citing cases under federal employment statutes)); *see also Bynum v. Mack Mech., Inc.,* No. 2:16-0023. 2016 WL 6138607, at * 2 (M.D. Tenn. Oct. 21, 2016).[9] This principle applies to federal employment retaliation claims as well. *Wheatley v. West Central Mich. Emp't & Training Consortium*, *Inc.,* 341 F. Supp. 3d 753, 768 (W.D. Mich. 2018) (employer not liable for retaliation under Title VII because he was an independent contractor, not an employee); *Farrell v. Finchum Sports Floors*, No.3:14-cv-565, 2018 WL 283247, at * 3 (E.D. Tenn. Jan. 3, 2018) (Title VII protects employees, but not independent contractors, from retaliation).

As for Plaintiff's retaliation theory, the relevant statute states: "It is a discriminatory practice for a *person* . . . . to retaliate or discriminate in any manner against a *person* because such *person* has opposed a practice declared discriminatory by this chapter." Tenn. Code Ann. § 4-21-301(a)(1). Again, Defendant argues that Plaintiff cannot rely upon this provision because she is

---

[9] The Court also notes that Interstate was not the employer of the candidates selected from among those Plaintiff sent to it for consideration. As clearly set forth in the Agreement, the selected candidates were employees of *Plaintiff*, with Plaintiff being responsible for the usual employer administrative tasks, such as paying taxes and providing health benefits. (Doc. No. 40-1). The Amended Complaint states that Plaintiff contracted with Defendant "for the placement of *Spencer Staffing employees*." (Doc. No. 22 at ¶ 5) (emphasis added).

not an employee, and Interstate is not her employer. Plaintiff argues there is no requirement that she be an employee to bring a retaliation claim. She notes that "persons" are protected from retaliation, then argues in essence that "persons" is a term broader than "employees" and one that Tennessee courts have instructed should be construed broadly. (Doc. No. 47 at 13).

The parties dispute whether the Court may look to federal law in interpreting the retaliation provision of the THRA. One of the stated purposes of the THRA, however, is to provide for execution within Tennessee of the policies embodied in Title VII and other federal civil rights laws. Tenn. Code Ann. § 4-21-101(a)(1). Generally, courts interpret the THRA similarly, if not identically, to Title VII, although they are not obligated to follow or be limited by federal law in interpreting the THRA. *Ferguson v. Middle Tenn. State Univ.,* 451 S.W.3d 375, 380-81 (Tenn. 2014); *Gregory v. Lowe's Home Ctrs., LLC,* No. 3:15-cv-00988, 2017 WL 2181552, at * 4 (M.D. Tenn. May 18, 2017). Given the similarity of the two statutes (THRA and Title VII), when applying the THRA, courts borrow the Title VII framework developed by federal courts. *Allen v. Cumberland Med. Ctr., Inc.*, No. 2:10-cv-0045, 2010 WL 3825667, at * 3 (M.D. Tenn. Sept. 24, 2010).

Notwithstanding Title VII's statutory language that refers to "individuals," courts have limited Title VII's protections to individuals who are employees. *Allen,* 2010 WL 3825667, at * 4 (citing *Birch v. Cuyahoga Cty. Probate Court*, 392 F.3d 151, 157 (6th Cir. 2004)). Although the THRA does not use the term "employees," its provisions do speak of "employers," and the Tennessee Supreme Court has looked to Title VII's definition of "employee" to define the reach of the THRA. *Id.* (citing *Bredesen v. Tenn. Judicial Selection Comm'n,* 214 S.W.3d 419, 430, 432 (Tenn. 2007)).Thus, claims under the THRA require an employer-employee relationship. *Adair v. Hunter*, 236 F. Supp. 3d 1034, 1047 (E.D. Tenn. 2017) (Tennessee Supreme Court requires that

there be an employer-employee relationship in order for the THRA to provide the relief plaintiffs seek).

Plaintiff contends that because the THRA is "broader" than Title VII, liability should extend to any individual for retaliation against any individual because of her opposing practices made unlawful by the THRA, citing (among other things) *Carr v. UPS,* 955 S.W.2d 832 (Tenn. 1997). (Doc. No. 47 at 12 n. 4). *Carr* does hold, as Plaintiff notes, that "the THRA is broader than Title VII in terms of who may be held liable for harassment and discrimination." *Id.* at 835. But that is not the end of the story, or even the probative part of the story.

In *Carr*, the court found that the THRA is broader than Title VII because it (1) applies to entities employing fewer employees than required by Title VII, and (2) extends liability to persons who "[a]id, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory by this chapter."[10] *Id.* at 835-36. But in so holding, *Carr* was addressing only who was liable, not who was protected. *Carr* does not say that non-employees are protected under the THRA's retaliation provision, and Plaintiff does not cite a single case holding otherwise; notably, the cases she cites addressing the term "person" in the THRA's retaliation provision deal with who is liable rather than who is protected, and one (*Bredesen*, 214 S.W.3d at 430) did not deal with the retaliation provision at all.

*Carr* also states that "[a]lthough the language of Title VII and the THRA differ slightly, it is clear that the legislature intended the THRA to be coextensive with federal law." *Id.* at 834. *See also Lynch v. City of Jellico*, 205 S.W.3d 384, 399 (Tenn. 2006) (stating that because "[t]he intent

---

[10] *Carr* was overruled on other grounds by *Parker v. Warren Cty Utility District*, 2 S.W.3d 170 (Tenn. 1999). In *Parker*, the court actually modified *Carr* to bring it in line with more recent federal (Title VII) law on supervisor sexual harassment. *Id*. at 176.

of the THRA is to provide for execution within Tennessee of the policies embodied in the federal civil rights statutes ... an analysis of claims under the THRA is the same as under Title VII of the Federal Civil Rights Act"). Thus, in part *Carr* rejected the plaintiff's expansive view of "employer" liability under the THRA—*i.e.,* that employees of an employer could be individually liable—because it "agree[d] with the federal courts' analyses" rejecting that view and because "the slight deviation of THRA's definition of employer from Title VII's definition does not warrant an interpretation that would be inconsistent with Title VII." *Carr,* 955 S.W.3d at 835. Concededly, as noted, *Carr* did recognize the THRA's broader view of employer liability in certain other contexts. But this was based on discrete provisions of the THRA wholly absent from Title VII. *Id.* at 835-36. The upshot seems to be that when the THRA has separate provisions that go beyond Title VII's provisions in terms of employer liability, they will be given effect by Tennessee courts despite their divergence from Title VII. But Tennessee courts will not rely on "slight variations" in the two parallel statutes' language to justify *expanded employer liability* under the THRA.

The same logically should pertain to the issue of *expanded protection* under the THRA: "slight variations" in the statutory language do not justify expansion of protection under the THRA beyond the protection provided by Title VII. Here, the difference is between protection against retaliation for "persons" (per the THRA) and protection against retaliation "for employees or applicants for employment" (per Title VII, 42 U.S.C.A. § 2000e-3(a)). There is a variation here, as the term "person" is broader than "employee" as a general matter, and Plaintiff says that this is dispositive. But she cites no case law recognizing this variation as significant, let alone dispositive on the current issue. And given that the Tennessee legislature intended the THRA to be co-extensive with Title VII, there is no reason to believe that when the legislature used the term "person" in its retaliation provision, without any indication that it be construed in any particular

way, it meant for the term to provide protection for "persons" beyond those persons protected by Title VII—*i.e.*, employees and applicants for employment. The term "persons," after all, does not necessarily mean "any and all persons, no matter who they are and whether the statute intends to protect them from retaliation" rather than "persons intended to be protected from retaliation"— meaning employees and applicants for employment, under Title VII principles generally embraced by Tennessee courts.

*Ferguson v. Middle Tennessee State Univ.,* 451 S.W.3d 375, 382 (Tenn. 2014) is not dispositive on this issue, but it tends to support the equation of "person" with employee. Virtually the Court's entire discussion was framed in terms of the THRA, in purpose and in function, protecting "employee[s]" from retaliatory acts of *their* employers. True, *Ferguson* did not expressly preclude the possibility of protection for persons who oppose the retaliation of someone else's employer, and it included two quotations that tend to support the notion of protection for non-employees.[11] But those quotes are directly proceeded by a concern framed in terms of employees: "If employees do not receive protection from retaliatory conduct after they complain about discrimination, they will be less likely to report discriminatory conduct." *Id.* at 381. The overall impression is that *Ferguson* was assuming—albeit not deciding—that the THRA's protections against retaliation were for employees *only*. *Ferguson* thus supports Defendant's position to some extent.

---

[11] "'To a large extent, the effectiveness and very legitimacy of discrimination law turns on people's ability to raise concerns about discrimination without fear of retaliation.' Deborah L. Brake, *Retaliation,* 90 Minn. L. Rev. 18, 20 (2005). Without protection from retaliation, 'challenging employment discrimination would be nearly impossible.' Henry L. Chambers, Jr., *The Supreme Court Chipping Away at Title VII: Strengthening It or Killing It?* 74 La. L. Rev. 1161, 1180 (2014)." *Ferguson,* 451 S.W.3d at 381.

Plaintiff's contrary position is not frivolous.[12] But for the reasons set forth above, the Court finds that Plaintiff, who was never an employee (or applicant for employment) of Defendant, cannot sustain a THRA claim against Defendant under a retaliation theory. As with Title VII, the anti-retaliation provision of the THRA is designed to prohibit *employer* actions that are likely to deter *employees* from filing complaints with the EEOC or otherwise asserting their rights under anti-discrimination statutes. *Ferguson*, 451 S.W.3d at 381;*Clough v. State Farm Mut. Auto Ins. Co.,* No. 13-2885, 2014 WL 1330309, at * 2 (W.D. Tenn. Mar. 28, 2014) (THRA applies only to "employers" and thus protects only "employees.").

Having found that Plaintiff is not entitled to bring THRA claims under these circumstances, the Court need not reach the parties' other arguments as to those claims.[13] For all these reasons, Defendant has shown that it is entitled to judgment as a matter of law on Plaintiff's THRA claim, and summary judgment for Defendant will be entered on  that claim.

## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS

Count Two of the Amended Complaint asserts a claim for intentional interference with business relationships, whereby Plaintiff must demonstrate: (1) an existing business relationship

---

[12]  Plaintiff invokes the Americans with Disabilities Act (ADA) and the Rehabilitation Act, noting that federal appellate courts have construed their retaliation provisions to protect a broad category of persons and not just persons protected from discrimination under those statutes; she claims that the THRA's retaliation provision should be construed likewise. (Doc. No. 47 at 12-13 & n.5). The Court disagrees, because it is clear that the THRA is to be construed in harmony with Title VII and not the ADA or Rehabilitation Act.

[13] The Court notes, however, that Plaintiff likely could not establish one of the elements of a retaliation claim under the THRA, due to the absence of an "adverse employment action." An adverse employment action requires a materially adverse change in the terms and conditions of *employment*. *Norman v. Rolling Hills Hosp., LLC*, 820 F. Supp. 2d 814, 822-23 (M.D. Tenn. 2011). Moreover, Plaintiff's argument that she has direct evidence of retaliation misses the mark. The alleged "direct evidence" she claims is alleged evidence of discrimination, not retaliation.

with specific third parties or a prospective relationship with an identifiable class of third persons; (2) Defendant's knowledge of that relationship and not a mere awareness of Plaintiff's business dealings with others in general; (3) Defendant's intent to cause the breach or termination of the business relationship; (4) Defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. *Trau-Med of Am., Inc. v. Allstate Ins. Co.,* 71 S.W.3d 691, 701 (Tenn. 2002), *cited in Best Choice Roofing & Home Improvement, Inc. v. Best Choice Roofing Savannah, LLC,* No. 3:18-cv-00615, 2020 WL 1139873, at * 15 (M.D. Tenn. Mar. 9, 2020). Significantly, the claim can be based either on an existing business relationship or a prospective business relationship. To evaluate this claim, the Court must first delineate the specific business relationships allegedly interfered with—an undertaking to which the parties devote too little attention.

The Amended Complaint (Doc. No. 22) alleges that Plaintiff had business relationships with workers "to be placed at Interstate Warehousing." ¶ 42. It appears that these workers were not employees of Plaintiff (or of Defendant), but rather *applicants* for employment by Plaintiff for a position at Interstate. As explained by Plaintiff (apparently without material dispute from Defendant):

> The process for hiring was straightforward: Ms. Walton would go to American Job Centers and interview applicants for stand-up forklift operator positions at Interstate. *Id.*, ¶ 10. Ms. Walton would submit the applications of candidates to Interstate's human resources manager, Brian Blaylock, or Maddie Morris, a human resources generalist, usually by e-mail. *Id.*, ¶ 11. Mr. Blaylock or Ms. Morris would then reply, usually by e-mail, telling Ms. Walton which candidates Interstate would like to interview and which ones it did not. *Id.*, ¶ 12. Ms. Walton would then contact the applicants to set up the interviews. *Id.*, ¶ 13. If they were hired by Interstate, the employees would remain on Ms. Walton's payroll for 90 days, and Interstate would pay Spencer Staffing for those employees' services. *Id.*, ¶ 14. Ms. Walton would then pay her employees. *Id.* After approximately 90 days, if the employee had performed well, he would be officially hired by Interstate and move from Spencer Staffing's payroll to Interstate's. *Id.*, ¶ 15.

(Doc. No. 47 at 3). Notably, all applicants to which this count pertains—*i.e.*, the applicants whose business relationships with Plaintiff were allegedly interfered with by Defendant—never became employees of Plaintiff, because they were the ones Defendant (allegedly wrongfully) refused to have placed with Defendant. Thus, their relationships with Plaintiff were that they were mere *applicants* for employment—a fact borne out by the record, which includes several "Application[s] for Employment" of applicants allegedly rejected for discriminatory reasons. (Doc. No. 48-1, *passim*). There is no evidence whatsoever that Defendant intended to, or did, hinder those relationships as required by the third element of this cause of action; the record is quite clear that these applicants completed their applications to Plaintiff's satisfaction, and they were then submitted to Defendant for consideration. This claim thus fails as to the existing business relationships claimed by Plaintiff.

Perhaps sensing this, Plaintiff focuses in her brief in opposition on how Defendant, via its alleged discriminatory consideration and rejection of female applicants, interfered with Plaintiff's "prospective contractual relations," *i.e.,* interfered with her prospect of obtaining employees. Plaintiff contends that Interstate interfered with those prospective contractual relations *(i.e.*, a prospective employer-employee relationship with applicants subjected to Defendant's discriminatory practices) by refusing to accept (or even interview) female candidates, who if accepted by Defendant would have become Plaintiff's employees. (Doc. No. 47 at 20). She claims that Interstate's refusal to accept these candidates was based on sex, which is an improper discriminatory motive. (*Id.*) Defendant argues in response that Plaintiff cannot show that it intended to interfere in her business relationships or had a motive to injure Plaintiff.

Defendant contends that Plaintiff has basically pled herself out of a claim for tortious interference with business relationship by asserting that Defendant's intent was to not accept (or

even interview) certain people (women). This is something different from an intent to interfere with prospective employment relationships between Plaintiff and the relevant applicants. A company intent on refusing (rightly or wrongly) to consider certain of a staffing company's applicants might give no thought whatsoever to the applicant's relationship with the staffing company; indeed, if this policy of refusal is especially important to the company (which is precisely what Plaintiff alleges here), it likely would not be concerned one way or the other with that third-party relationship. Defendant has correctly pointed out Plaintiff's core assertion, thus shifting the burden to Plaintiff to at least raise a genuine issue as to Defendant's intent to interfere with that prospective employment relationship. But Plaintiff brushes past this argument, merely stating that Interstate did not interview or accept any women that she sent them, causing the breach of Plaintiff's relationships with those women. (Doc. No. 47 at 20). She does not address, at this point, the intent of Interstate in making its decisions; she certainly does not point to any evidence suggesting that Defendant may have had an intent to interfere with the Plaintiff-applicant relationship. Plaintiff has not raised a genuine issue of material fact that Interstate's intent was to interfere with her prospective employment relationships with certain candidates.

Defendant has carried its initial burden of demonstrating no genuine issue of material fact and that it is entitled to judgment as a matter of law as to Plaintiff's intentional interference with business relationships claim, and Plaintiff has failed to come forward with evidence to rebut that showing. Therefore, summary judgment for Defendant will be entered on Plaintiff's claim for intentional interference with business relationships.

## BREACH OF CONTRACT[14]

Plaintiff's Amended Complaint alleges that by failing to accept qualified female workers[15] and by retaliating against Plaintiff, Defendant "intentionally, fraudulently, maliciously, or recklessly breached the parties' contract." (Doc. No. 22 at ¶ 49). But as Defendant noted in its brief in support of its Motion, the Amended Complaint does not identify any provision of the Agreement that was allegedly breached, and certainly no such provision is readily apparent. In her brief in opposition, Plaintiff again failed to identify any such provision. Instead, Plaintiff made a trio of arguments, two relating to a breach premised on discriminating against candidates in protected groups, and another related to a breach premised upon Defendant terminating the Agreement in retaliation for her opposing such discrimination.

In her first argument, Plaintiff claims that the parties' Agreement is valid, but that if it was construed as not prohibiting illegal discrimination, it would be an illegal contract and thus unenforceable. (Doc. No. 47 at 22-23). She posits, "In other words, Plaintiff and Defendant could not have contracted for Defendant to reject Plaintiff's employees due to gender discrimination; that would be an illegal and void contract." (*Id.* at 23). But the question is not whether Defendant contracted for Defendant to reject Plaintiff's employees due to gender discrimination; neither side claims (and no evidence suggests) that Defendant did this.[16] The Court need not and will not decide

---

[14] In Tennessee, a viable claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) non-performance amounting to a breach of that contract; and (3) damages caused by the breach of contract. *F.S. Sperry Co,* 304 F. Supp. 3d at 701.

[15] As indicated above, the Amended Complaint also alleges that Defendant refused to accept male workers older than 40, although Plaintiff no longer actively bases her claim upon this allegation.

[16] Defendant does assert that it did *not* contractually bind itself *not* to discriminate, but that is not the same as asserting that it contractually obtained for itself an affirmative prerogative to discriminate.

this issue based on what did not happen. Instead the Court asks whether the Agreement was breached based on what did happen.

Plaintiff's second argument is based on the duty of good faith and fair dealing implied in every contract. The argument is, in essence, deployed against a formidable argument by Defendant refuting that it breached the Agreement by discriminating against certain applicants for employment. Defendant of course denies engaging in such discrimination. But even if it had so discriminated, it argues, nothing in the Agreement required it to accept certain workers. After all, the Agreement specifically states that Interstate has the right to reject any applicant referred by Plaintiff.[17] The terms of the Agreement do not require Interstate to accept workers, male or female, even if they are qualified. Defendant has a point; it is hard to see how Defendant could have violated the terms of the Agreement as written.

But that is where the duty of good faith and fair dealing comes in. It is well established that, in Tennessee,[18] the common law imposes a duty of good faith in the performance of contracts. *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013). It is also well established that the laws affecting enforcement of a contract, and existing at the time and

---

[17] Plaintiff (and her applicants) also had the right to reject any potential placement with Interstate. (Doc. No. 40-1).

[18] Plaintiff asserts that Tennessee law applies here despite the existence of an Indiana choice-of-law provision in the parties' Agreement. (Doc. No. 47 at 21-22 n.6). The Court agrees but also notes that some (though not all) of the arguments made with respect to this count are so basic that the identity of the particular applicable law almost certainly would make no difference.

place of its execution, enter into and form a part of the contract.[19] *Id.* at 668; *In re: Rader Bonding Co., Inc.*, 592 S.W.3d 852, 860 (Tenn. 2019).

The "breach of the duty of good faith and fair dealing 'is not a cause of action in and of itself but is a part of a breach of contract cause of action.'" *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 699 (M.D. Tenn. 2018) (quoting *Doe v. Univ. of the South*, No. 4:09-cv-62, 2011 WL 1258104, at *18 (E.D. Tenn. Mar. 31, 2011). It may be more apt to say that the duty of good faith and fair dealing is a part of every contract. The implied covenant of good faith and fair dealing creates a duty to provide basic fairness. *Id.*[20] While the implied covenant does not create new contractual rights or obligations, it protects the parties' reasonable expectations as well as their rights to receive the benefits of their agreement. *Dick Broad.*, 395 S.W.3d at 666. Thus, "there is an implied covenant of good faith and fair dealing in every contract, whereby neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* at 662 (quoting 17A Am.Jur.2d *Contracts* § 370 (2004)). The general idea, at least in pertinent part, seems to be that one party cannot in bad faith get in the way of the counterparty's satisfaction of a contract condition that would result in the counterparty's realization of a benefit under the contract. In the Court's view, the following hypothetical demonstrates the principle. If a landowner agrees to pay a painter a $10,000 commission if she completes a "satisfactory" landscape of the landowner's estate, the landowner breaches the covenant of good faith and fair dealing—and thus the contract—if he stops allowing the painter

---

[19] When this Agreement was signed, the law was clear both that every contract included an implied covenant of good faith and fair dealing and that an employer could not discriminate, based upon gender, in hiring employees.

[20] In some cases, the courts have expressed this principle as allowing the qualifying word "reasonable" and its equivalent "reasonably" to be read into every contract. *Dick Broad.*, 395 S.W.3d at 661.

onto his estate after the painter has completed most of the painting; the covenant protects the painter from the argument that she, not having "completed" a "satisfactory" landscape, is contractually not entitled to a commission.

As early as 1922, the Tennessee Supreme Court imposed an implied condition of reasonableness in a contract requiring the sellers of land to find "satisfactory" the price of land sold at auction in order for the auctioneer to be paid a commission. *Robeson & Weaver v. Ramsey*, 146 Tenn. 25, 245 S.W. 413, 413 (Tenn. 1922), *cited in Dick Broad.*, 395 S.W.3d at 660. Where the contract was silent as to "the standard of conduct anticipated by the parties in the performance agreement; i.e.*,* the sellers providing consent to the sale price as 'satisfactory,' the Court rejected a standard allowing the sellers to act capriciously and required them to act in a commercially reasonable manner." *Dick Broad.,* 395 S.W.3d at 660 (citing *Robeson & Weaver*, 245 S.W. at 415); *see also German v. Ford*, 300 S.W.3d 692, 705, n.9 (Tenn. Ct. App. 2009) (when a contract is contingent on one party's satisfaction, that party must exercise his own judgment in good faith and as a reasonable person).

The Court finds this principle to be applicable in this case. The Agreement plainly contemplated Plaintiff submitting to Defendant qualified and competent candidates for placement with Defendant. In its very first line, the Agreement unsurprisingly also contemplated (without promising) that Defendant would accept some of these candidates for placement, and it required Defendant to pay Plaintiff fees for accepted candidates. Although the terms of the Agreement provided that Interstate had the right to reject any candidate referred by Plaintiff, the implied covenant of good faith and fair duty, for the reasons set forth in the above-cited cases, required Interstate to exercise its judgment in good faith and reasonably. In other words, Defendant's contractual prerogative to refuse an applicant was qualified by a duty to exercise that prerogative

in good faith. If, as Plaintiff alleges, Interstate exercised its judgment in a discriminatory way, then a jury could find that Interstate breached the Agreement as qualified by the implied covenant—by frustrating, in bad faith by discriminating against women, Plaintiff's contemplated contractual benefit (fees for submitted and placed candidates) to be obtained from its efforts in performing under the contract by submitting competent and qualified female candidates. The jury could find a breach, in other words, in Defendant avoiding payment of fees with respect to female applicants that *would have been payable* (if so found by a jury)[21] had Defendant not in bad faith prevented such fees from ever becoming payable under the *letter* of the Agreement. Viewed slightly differently, if Defendant exercised its discretion (to refuse candidates) in a discriminatory way, then a jury could find that Defendant breached a promise in the Agreement (as qualified by the implied covenant) not to reject candidates on unreasonable grounds.

In *Town & Country Equip., Inc. v. Deere & Co.*, 133 F. Supp. 2d 665 (W.D. Tenn. 2000), the court imposed a reasonableness requirement upon contractual provisions requiring consent to an assignment, where the agreement did not provide for the standard of conduct for withholding consent. *Id*. at 670, cited in *Dick Broad.*, 395 S.W.3d at 662. That court concluded that the defendant did not have to right to unreasonably limit or interfere with the sale. *Id*. The case demonstrates the applicable principle here: seemingly unconstrained discretion to refuse or give consent is qualified by the covenant of good faith and fair dealing.

---

[21] The Court notes that Plaintiff, to prevail at trial, would need to satisfy all elements of a breach of contract claim, including damages resulting from the alleged breach. To prove damages, she well may have to prove that specific rejected female candidates would have been hired (and thus generated fees for Plaintiff) but for Defendant's alleged breach. However, the Court does not intend to, and does not, say anything definitive about this at this juncture because the issue is not presently before it.

Again, if Interstate discriminatorily refused to consider women for positions within its company, a jury could reasonably find that that conduct was not taken in good faith and was a violation of the implied covenant of good faith and fair dealing, resulting in a breach of the Agreement. And Plaintiff has offered evidence of the alleged gender discrimination; she offers evidence suggesting that Defendant did not accept female candidates and has testified that Defendant's Human Resources staff told her Defendant did not accept women for these forklift operator positions. Defendant denies these factual allegations. But Plaintiff has demonstrated genuine issues of material fact as to whether Defendant actually discriminated against women and, thereby, breached the Agreement as qualified by the implied covenant.

As indicated above, Plaintiff makes a third argument, one related to Defendant's alleged breach of the Agreement via its termination of the Agreement. Plaintiff asserts, as being analogous here, the principle that an employment contract cannot be terminated for illegal cause. She asserts that Defendant breached the Agreement by terminating it for an illegal purpose, retaliation for her opposition to Defendant's gender discrimination. However, the Agreement says nothing about the right to terminate—indeed, it does not include any provision for how, or under what circumstances, a party may terminate the Agreement. In other words, there is no applicable term (or terms) of the contract concerning termination for the implied covenant to qualify and thereby create a cause of action where the language of the contract seemingly would not support one. And the *termination* of the Agreement does not raise the kinds of concerns implicated by the implied covenant of good faith and fair dealing, which is that a party *continuing to perform under a non-terminated agreement* is essentially cheated out of the contractual benefits it is supposed to obtain by performing.

The implied covenant serves to prevent a party from suffering a bad faith denial of the benefit of its bargain, or the fruits of its performance, under the contract. Those purposes are inapplicable in the case of Defendant's termination of the Agreement. The termination effectively meant that Defendant stopped considering Plaintiff's candidates for future placement. And Plaintiff did not bargain for anything other than unilateral cessation and some point, and the whole idea of the cessation was for Plaintiff to stop any further performance under the Agreement before Plaintiff could even undertake efforts for which she might earn compensation.

In other words, if a party terminates a contract like the Agreement,[22] even if "unfairly," the result is that the counterparty ceases to put effort into performing under the contract. The result is not that the counterparty is cheated out of the payoff it should receive from its efforts, which is the primary concern of the implied covenant. Here, the termination of the Agreement resulted in Plaintiff ceasing her efforts to place candidates with Defendant, rather than in her being deprived of her just reward for either past placement efforts or future placement efforts (which, because of the termination, will not in fact occur).

The Court finds that Defendant is entitled to summary judgment on Plaintiff's claim that Interstate breached the Agreement by terminating the Agreement allegedly in retaliation for her alleged "protected activity," but not on Plaintiff's claim that Interstate breached the Agreement by refusing to accept female applicants.

---

[22] By this, the Court means a contract that (i) is of indefinite duration, (ii) is intended to last only as long as both parties wish to continue the business relationship established by the contract, and (iii) calls for one party to be compensated by the other party based only on intermittent and discrete acts of performance (in this case, Plaintiff's recruiting and placement of individual candidates) undertaken by the first party at its option.

## **CONCLUSION**

For the reasons explained herein, Defendant's Motion for Summary Judgment (Doc. No. 40) will be granted in part and denied in part. Plaintiff's claims based upon the THRA, her claims for intentional interference with business relationships, and her claim for breach of contract as it relates to termination of the Agreement will be dismissed. The sole remaining claim is Plaintiff's claim for breach of contract (as qualified by the implied covenant of good faith and fair dealing) for Defendant's refusal to accept female applicants.

An appropriate Order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE